UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CV-61703-BLOOM/VALLE

YESHUA ESPAILLAT,

      Plaintiff,

v.

ANDREW SAUL,
Commissioner of
Social Security Administration,

      Defendant.
_____/

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE

THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment (ECF No. 21) and Defendant's Motion for Summary Judgment (ECF No. 25). United States District Judge Beth Bloom has referred the Motions to the undersigned for a Report and Recommendation. *See* (ECF No. 20).

After due consideration of the record and the parties' briefs, including Defendant's Response (ECF No. 26) and Plaintiff's Reply (ECF No. 28), and being otherwise fully advised in the matter, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment (ECF No. 21) be **DENIED**, that Defendant's Motion for Summary Judgment (ECF No. 25) be **GRANTED**, and that the Administrative Law Judge's Decision ("ALJ's Decision") be **AFFIRMED** for the reasons set forth below.

## I.      PROCEDURAL HISTORY

On February 19, 2016, Yeshua Espaillat ("Plaintiff") applied for disability benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C

§ 401 *et seq.*, alleging a disability onset date of October 3, 2015.  (R. 211-14, 215-20).[1]  Claimant's claims were denied initially and again upon reconsideration.  (R. 106-08, 113-17, 118-22). Thereafter, Claimant requested a hearing, which was held on July 12, 2018 before Administrative Law Judge ("ALJ") J. Leland Bentley.  (R. 34-62, 123-24).  Plaintiff, appearing with counsel, testified at the hearing.  (R. 38-56).  A Vocational Expert also testified.  (R. 56-60).  On July 27, 2018, the ALJ issued a decision denying Plaintiff's applications and finding that Plaintiff was not disabled within the meaning of the Act.  (R. 7-23).

Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's Decision the Commissioner's "final decision." (R. 1-6); *see Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Plaintiff now seeks judicial review of the ALJ's Decision.  (ECF No. 1); *see also* 42 U.S.C. § 405(g).  Both parties have moved for summary judgment, and the Motions are ripe for adjudication.

## II.      STANDARD OF REVIEW

Judicial review of the ALJ's Decision is limited to whether there is substantial evidence in the record as a whole to support the ALJ's finding and whether the ALJ applied the correct legal standards in making his determination.  *Carson v. Comm'r of Soc. Sec.*, 440 F. App'x 863, 864 (11th Cir. 2011) (citations omitted); *see also* 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Carson*, 440 F. App'x at 864 (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)); *accord Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987) (substantial evidence is "more than a scintilla, but less than a preponderance").

---

[1] All references are to the record of the administrative proceeding filed as part of the Defendant's Answer.  *See* (ECF No. 18).

A court, however, "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted). Even if evidence preponderates against the ALJ's Decision, a court must affirm "if the decision is supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citing 42 U.S.C. § 405(g)). Within this narrow role, however, courts do not act as automatons. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Rather, they "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* (citing *Bloodsworth*, 703 F.2d at 1239).

To qualify for benefits, a claimant must be disabled within the meaning of the Act. *See* 42 U.S.C. § 423 (standard for DIB) and § 1382 (standard for SSI). A claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

To determine eligibility, the ALJ employs a five-step sequential evaluation:

(1)   Is the person presently unemployed?
(2)   Is the person's impairment severe?
(3)   Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart. P, Appendix 1 (the "Listings")?
(4)   Is the person unable to perform his or her former occupation?
(5)   Is the person unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4) (evaluation process for DIB), 416.920(a)(4) (evaluation process for SSI). An affirmative answer to any of the above questions leads either to the next question or, on Steps 3 and 5, to a finding of disability. *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). A negative answer to any question, other than Step 3, leads to a determination of "not disabled." *Id.*

Importantly, the burden of proof rests on the claimant through Step 4. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 n.10 (11th Cir. 2004). At Step 4, the ALJ must consider: (i) the claimant's residual functional capacity ("RFC"); and (ii) the claimant's ability to return to his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The regulations define RFC as that which an individual is still able to do despite the limitations caused by his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ will "assess and make a finding about [the claimant's RFC] on all the relevant medical and other evidence" in the case. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC assessment is used to determine whether the claimant can return to his past relevant work under Step 4, and if so, "the ALJ will conclude that the claimant is not disabled." *Phillips*, 357 F.3d at 1238 (citations omitted). If a claimant cannot return to his past relevant work, then the ALJ proceeds to Step 5. *Id.*

At Step 5, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant "can make an adjustment to other work." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Phillips*, 357 F.3d at 1239 (citation omitted). The ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. *Phillips*, 357 F.3d at 1239. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. *Id.* Conversely, if the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant

is disabled. *Id.* The ALJ may determine whether the claimant has the ability to adjust to other work in the national economy by either: (1) applying the Medical Vocational Guidelines (contained within 20 C.F.R. part 404, subpart P, appendix 2); or (2) using a Vocational Expert, who can opine on whether someone with the claimant's limitations can obtain employment in the national economy. *Id.* at 1239-40.

## III.   THE HEARING RECORD

### A.   Plaintiff's Background and Hearing Testimony

Plaintiff, born on September 5, 1985, was 30 years old on the alleged disability onset date, and 32 years old at the time of the hearing. (R. 21, 34, 211). He has a seventh grade education, was able to communicate in English, and had past relevant work experience as an auto parts deliverer, retail sales clerk, and administrative clerk. (R. 21, 37, 38-41, 57, 235). Plaintiff alleged disability due to autism spectrum disorder, major depressive disorder, and generalized anxiety disorder. (R. 234).

In a March 2016 Function Report, Plaintiff reported that his ability to work was limited by unexplained "daily crying outbursts," "extreme anxiety" when outside the home (due to agoraphobia), and "panic attacks that have led to hospitalization." (R. 255). Plaintiff reported that he could shower and care for his personal hygiene. (R. 256-57). Plaintiff spent most of the day writing a book, and his hobbies included watching TV and using the computer. (R. 256, 259). According to Plaintiff, he was able to complete small household chores, like washing dishes, "with directions and supervision." (R. 257). Plaintiff did not cook, however, because he could not follow directions or remember what to do without help. *Id.* Plaintiff reported having "a very short" attention span, which made it difficult for him to follow written and spoken instructions. (R. 260). Moreover, due to agoraphobia, Plaintiff did not do any yard work and did not go

shopping on his own.  (R. 255, 257, 258).  Plaintiff stated that he is "rarely able to leave [his] house unless [for a] psychiatric appointment," and is only able to fall asleep with "anti-psychotic medication."  (R. 256).   Plaintiff reported "no problem getting along with authority figures" and others at work.  (R. 261).  According to Plaintiff, changes in his routine are stressful, and stress causes him to "shut[] down mentally."  *Id.*  Plaintiff reported that he takes Celexa (for depression management) and Risperdal (to help him sleep).  (R. 262).

On a Supplemental Pain Questionnaire also dated March 2016, Plaintiff reported emotional and mental health issues, but no physical pain.  (R. 249-51).  According to Plaintiff, he was unable to participate in social activities or do housekeeping, other than small tasks under supervision. (R. 251).  Plaintiff reported that he was "actively seeing [a] therapist 1-2 [times] per week" and a "psychiatric ARNP for medication [management] on a monthly basis."  (R. 250).

At the hearing, Plaintiff testified about his work history.  From July through December 2014, Plaintiff worked as a delivery driver for Auto Zone.  (R. 38).  Plaintiff was asked to quit after he suffered an unspecified panic attack on the job.  (R. 38-39).  From 2009 through 2013, Plaintiff worked at Best Buy as a salesperson, selling video games and televisions for four years. (R. 39-40).  Plaintiff was fired from Best Buy after suffering a panic attack, for which he claims he was hospitalized.  (R. 40).  Prior to working at Best Buy, Plaintiff worked as a retail sales clerk at Aeropostale, a clothing store.  *Id.*  At the same time, he was also working at "Auto Zone and another side job  . . . and lost track of . . . scheduling and missed too many shifts" and was fired from Aeropostale.  (R. 40, 55).  Before working at Aeropostale, Plaintiff worked at the Broward County Clerk's Office for approximately two years.  (R. 41).  He was fired from this job for insubordination, after complaining about his supervisor to Human Resources.  (R. 41-42).  Plaintiff testified that the retail sales and the Clerk's office jobs were difficult because he did "not always

understand what the customers wanted and . . . [had to ask] them to repeat [themselves]" so he could address their problem.  (R. 49, 55).  Plaintiff testified that he could not work because he felt "overwhelmed" and was "having anxiety."  (R. 42).

Plaintiff testified that he was diagnosed with autism, anxiety disorder, agoraphobia, and depression.  (R. 43, 44).  Plaintiff sought mental health treatment "about two to three years ago," and saw therapist Suzanne Peters [sic] every week.[2]  (R. 43-44).  Plaintiff was also treated by ARNP James Foster every month, "one on one," for prescriptions.  (R. 45).  Although ARNP Foster works under Dr. Hernan Pabon, Plaintiff could not recall having been treated by Dr. Pabon. *Id.*  Plaintiff reported he took his medications, which helped his condition, without any side effects. (R. 46).

Plaintiff further testified that he was hospitalized for one week in 2016 after he tried to commit suicide by overdosing on one of his prescription medications.[3]  (R. 42-43).  Plaintiff added that he has not gone out alone for three years, and lives with a friend who cooks for him, drives him to medical appointments, and generally helps him keep his life together.  (R. 46-47).  Other than with his roommate, Plaintiff does not socialize much and does not go out except to the movies infrequently.  (R. 47-48).  Plaintiff testified that although he has difficulty following instructions and gets overwhelmed, he did not have difficulty getting along with people while he was employed.  (R. 48-49).  According to Plaintiff, he cannot watch TV for more than one hour or use the computer for more than half an hour before his mind starts wandering.  (R. 49-50).  Plaintiff further testified that he is forgetful and uses Post-It Notes to remind himself of what needs to be done.  (R. 51).  When Plaintiff loses control, he yells, curses, and throws and breaks things.  (R. 50).

---

[2] Plaintiff's therapist was Suzanne Peterson.  *See* (R. 299).

[3] Although Plaintiff complained of having suffered panic attacks that resulted in other hospitalizations, this is the only hospitalization reflected in any of the medical records.

He testified that he has this type of episode every two weeks, and it takes him about an hour to an hour and a half to calm down.  *Id.*

### B.    Relevant Medical Records

The administrative record contains Plaintiff's mental health treatment records from July 2015 through June 2017.  *See generally* (Exs. 1F and 9F) (2015 records); (Exs. 2F, 3F, and 5F) (2016 records); and (Exs. 6F, 7F, and 8F) (2017 records).  Plaintiff received treatment from the following: (i) Care Resource; (ii) Motivational Institute - Mental Health Bridge Clinic; and (iii) SunServe.  (ECF No. 21 at 4-8).  These medical records are discussed below.

#### 1.   *Care Resource (July 2015)*

Plaintiff's first treatment record is dated July 24, 2015, when he visited Care Resource.  (R. 307-311, 409-13).  Plaintiff reported "no complaints" and sought to "establish care."  (R. 307, 308).  Plaintiff denied recent weight gain or loss, tiredness, changes in appetite, depression, suicidal thoughts, anhedonia, or other psychological symptoms.  (R. 307, 309).  Plaintiff reported no difficulty feeding himself, dressing, washing, or doing his own shopping.  (R. 308).  Upon examination, Plaintiff was alert, well-developed, well-nourished, and in no acute distress.  (R. 310).  Similarly, Plaintiff's appearance, mood, and affect were normal.  *Id.*  Plaintiff's only complaint was depression, which he said had worsened since his partner's death.  (R. 307).  Plaintiff scored 24 on the Patient Health Questionnaire ("PHQ-9") Depression Scale.[4]  (R. 310).

---

[4] The PHQ-9 is a self-reporting diagnostic questionnaire used to screen for depression.  The patient answers questions reflecting each of the nine DSM-IV criteria, by selecting from "0" (not at all) to "3" (nearly every day).  Each numerical response is combined for a total score.  A total score of between 20-27 is interpreted as "severe depression," warranting treatment using medication, psychotherapy and/or a combination of treatment.  https://www.mdcalc.com/phq-9-patient-health-questionnaire-9,  and  https://www.med.umich.edu/1info/FHP/practiceguides/depress/phq-9.pdf, (last visited July 20, 2020).  *See also* (ECF No. 21 at 4 n.5).

Accordingly, the provider increased Plaintiff's dosage of Celexa from 10 mg to 20 mg.[5]  (R. 310, 414).

### 2.   Motivational Institute - Mental Health Bridge Clinic (September 2015)

Plaintiff was referred to the Motivational Institute - Mental Health Bridge Clinic (the "Clinic") for psychological testing to rule out autism spectrum disorder.  (R. 326).  During the visit, Plaintiff reported that his behavior resembled autism, including "ordering behaviors, seeing patterns in everyday objects, learning differently compared to others, and self-described social deficits."  *Id.*  Plaintiff also reported depressed mood, sleep disturbance, fluctuations in appetite, and nervousness.  *Id.*  Plaintiff recounted that he was diagnosed with attention deficit disorder as a child and was prescribed Ritalin, which improved his school performance until he was taken off the medication at age 14.  (R. 327).  Plaintiff reported two prior hospitalizations for "anxiety attacks."  *Id.; but cf. supra note 3* (noting that medical records reflect only one hospitalization).

Plaintiff underwent several psychological screening tests, including: (i) Minnesota Multiphasic Personality Inventory-II ("MMPI-II"); (ii) Beck Depression Inventory-II ("BDI"); (iii) Beck Anxiety Inventory ("BAI"); (iv) Trails A & B; (v) Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"); and (v) Adult Asperger's Assessment ("AAA").[6]  *Id.*  Plaintiff was diagnosed with: (i) major depressive disorder, mild, based on the "severity of his depressive symptoms, including frequent depression most of the day, frequent sleep disturbance, decreased appetite, feelings of worthlessness, inability to concentrate, and other self-reported symptoms;" and (ii) autism spectrum disorder on a provisional basis, based on "deficits in social functioning, nonverbal communication (eye contact), and deficits in starting and

---

[5] Celexa is an antidepressant medication.  (ECF No. 21 at 4 n.6).

[6] These tests were administered by Dr. Lori Eickleberry, Ph.D., and Jonathan Wutke, B.A., psychology trainee, on September 14 and September 28, 2015.  (R. 326).

maintaining relationships . . . stereotyped ordering behaviors, and a visual fascination with patterns in objects." (R 331). The doctors recommended behavioral therapy for Plaintiff's depression and anxiety, social skills training to help enhance social interaction, muscle relaxation to relieve stress and anxiety, and suggested further assessment of Plaintiff's visuospatial difficulties and anxieties. (R. 332).

### 3.   SunServe Records (August 2015 - June 2017)

Between August 2015 and June 2017, Plaintiff visited SunServe for weekly therapy sessions and monthly prescription refills. (R. 43-44) (Plaintiff's testimony about weekly therapy sessions with therapist Suzanne Peterson);[7] (R. 44-45) (Plaintiff's testimony about monthly visits with Advanced Registered Nurse Practitioner ("ARNP") James Foster for medication refills); *see also* (ECF No. 21 at 6).

### a.   ARNP Foster's Treatment Notes

ARNP Foster saw Plaintiff (and/or refilled Plaintiff's prescriptions) three times in 2015: August, September, and October. (R. 374) (August prescription refill); (R. 369-70, 373) (September treatment notes and prescription refill); (R. 368, 371-72) (October treatment notes and prescription refill). Upon mental status examinations during the September and October 2015 visits, Plaintiff's appearance was neat, speech was clear, mood was calm, affect was calm, thought process and content were intact, judgment and insight were intact, attention, concentration and memory were intact, and sleeping and appetite were fair. (R. 369, 371).

---

[7] Except for a June 8, 2018 letter from Suzanne Peterson, the administrative record does not contain any records from Plaintiff's therapy sessions. *See* (R. 299). Nonetheless, in the June 8th letter, Ms. Peterson confirms that she has been Plaintiff's "mental health counselor since May of 2016." (R. 299).

In 2016, ARNP Foster treated Plaintiff (and/or refilled prescriptions) approximately 12 times between February 2016 and October 2016.  *See generally* (Exs. 2F, 5F).  At the February visit, despite Plaintiff's report that his mind was racing and that he was angry and not sleeping, mental status examination showed that Plaintiff was alert and oriented as to person, place and time, his appearance was neat, speech was clear, thought process and content were intact, judgment and insight were intact, and attention, concentration, and memory were also intact.  (R. 366).

On March 2, 2016, Plaintiff  reported feeling "great," although his mood was depressed.  (R. 323).  Plaintiff returned on March 16, 2016, complaining that his depression was returning and that his medication (Celexa) was not as effective as before.  (R. 357, 359).  Upon mental status examination,  however, other than depressed mood and affect, Plaintiff's mental status results were normal.  (R. 357).  Similarly, treatment notes for April, June, and July also reflect depressed mood and affect, but otherwise show Plaintiff was alert and oriented to person, place and time, his appearance was neat, speech was clear, thought process and content were intact, judgment and insight were intact, attention, concentration and memory were intact, and sleeping and appetite were fair.  (R. 347, 349, 352, 355).  At the September and October visits, Plaintiff reported that he was "doing ok."  (R. 338, 342).  Mental status examinations reflected that, although Plaintiff's affect was flat, Plaintiff's appearance, speech, thought process, thought content, judgment and insight, attention, concentration, and memory were all intact.  (R. 338, 342).

In 2017, ARNP Foster saw Plaintiff (and/or refilled prescriptions) five times between January and June 2017.  *See generally* (Exs. 6F and 8F).  At the February and March visits, Plaintiff reported he was "doing ok" and was there for "refills."  (R. 393, 397).  During these visits, although Plaintiff's mood was anxious, all other mental status results were intact.  (R. 397).  In May and

June, Plaintiff stated that he was "doing ok," and other than anxious mood and flat affect, Plaintiff's mental status was intact.  (R. 385, 388).

### b. June 2018 Letter from Suzanne Peterson

On June 8, 2018, Plaintiff's therapist, Suzanne Peterson, wrote a letter, addressed to "whom it may concern."  (R. 440) (Ex. 11F).  In the letter, Ms. Peterson, a registered mental health counseling intern, reported that she had treated Plaintiff since May 2016 for extreme social anxiety. *Id.*  According to Ms. Peterson, Plaintiff's social anxiety makes it "extremely challenging for him to understand and communicate in stressful situations and in unfamiliar surroundings."  *Id.* Ms. Peterson opined that Plaintiff's anxiety in stressful situations would "compromise his ability to understand and articulate important information" at his disability hearing and that Plaintiff would benefit from having his caregiver accompany him to the administrative hearing.  *Id.*

### C.    Vocational Expert's Testimony

The Vocational Expert testified that Plaintiff's past relevant work included work as an administrative clerk (light work with an SVP of 4) and sales clerk (light work, with an SVP of 3). (R. 57); *see* (R. 21).

The ALJ questioned the Vocational Expert regarding a hypothetical individual of Plaintiff's age, education, and previous work experience, with no exertional limitations, but with the following mental restrictions.  The individual:  (i) could understand, remember and apply simple instructions; (ii) could concentrate and persist for extended periods to complete simple work with routine supervision; (iii) would need to avoid fast-paced assembly-type jobs with strict quotas; (iv) could maintain superficial work relationships with coworkers and supervisors;

(v) would need to avoid work relationships with the general public; and (vi) could adapt to routine work setting in which changes were introduced gradually.[8]  (R. 57-58).

In response, the VE testified that such an individual could not perform Plaintiff's past relevant work but could perform other work in the national economy, such as dishwasher (medium, unskilled position), laundry worker (medium, unskilled position), motel housekeeper (light, unskilled position), and industrial cleaner.  (R. 58-59).  If, however, the same individual were further limited to being off task 20% of a typical workday, then that individual would not be able to maintain any job.  (R. 59).

Upon questioning by Plaintiff's counsel, the VE further testified that the individual would need to be able to concentrate and focus for two hours at a time to maintain any job.  (R. 60). Moreover, an individual who could not sustain an ordinary routine without increased supervision would not be able to maintain a job.  *Id.*  Lastly, if the individual were unable to or markedly impaired in his ability to perform at a consistent pace without long and frequent "unreasonable" rest periods, that individual would also not be able to maintain a job.  (R. 60-61).

## IV.     THE ALJ'S DECISION

After reviewing the evidence and conducting the requisite five-step analysis, the ALJ concluded that Plaintiff "has not been under a disability, as defined by the Social Security Act, from October 3, 2015, through the date of this decision."  (R. 22).

At Step 1, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 3, 2015, the alleged onset date.  (R. 12).

At Step 2, the ALJ found that Plaintiff had the following severe impairments:  major depressive disorder, autism spectrum disorder, and anxiety.  *Id.*

---

[8] The ALJ adopted this hypothetical as Plaintiff's RFC assessment.  *See* (R. 14).

At Step 3, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  (R. 12-14).

At Step 4, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: (i) able to understand, remember and apply simple instructions; (ii) concentrate and persist for extended periods to complete simple work tasks with routine supervision; (iii) would need to avoid fast-paced assembly-type jobs with strict quotas; (iv) would be capable of maintaining superficial work relationships with supervisors and coworkers; (v) would need to avoid work-related contact with the general public; and (vi) could adapt to a routine work setting in which changes to the work environment would be gradual.  (R. 14).

In reaching this conclusion at Step 4, the ALJ considered Plaintiff's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as opinion evidence.  (R. 15, 18).  Although the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (R. 16).  Nonetheless, the ALJ concluded that Plaintiff was not able to perform any of his past relevant work and proceeded to Step 5.   (R. 21).

At Step 5, the ALJ found that there were other jobs in the national economy that Plaintiff could perform, such as dishwasher, laundry worker, motel housekeeper, and industrial cleaner. (R. 21-22).  Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (R. 22).

## V.   DISCUSSION

Plaintiff raises five primary arguments on appeal.   First, Plaintiff argues that the ALJ committed reversible error in failing to evaluate the opinion of Dr. Hernan Pabon, who Plaintiff claims is his treating physician.   (ECF No. 21 at 12-14).   Second, Plaintiff asserts that the ALJ erred in assessing Plaintiffs RFC by assigning: (i) "little weight" to ARNP Foster's treatment records and opinions; and (ii) greater weight to the opinions of the non-examining State Agency physicians.   (ECF No. 21 at 14-19).   Third, Plaintiff argues that the ALJ erred in evaluating Plaintiff's statements about the severity of his symptoms.   (ECF No. 21 at 19-22).   Next, Plaintiff alleges that the ALJ failed to fully develop the record.   (R. 22-23).   Lastly, Plaintiff argues that the ALJ's hypothetical to the VE failed to account for all of Plaintiff's non-exertional limitations. (ECF No. 21 at 23-25).

As discussed below, the undersigned finds that the ALJ applied the proper legal standards and that the ALJ's Decision is supported by substantial evidence.   Accordingly, the ALJ's Decision should be affirmed.

### A.   The ALJ Properly Weighed the Medical Evidence in Assessing Plaintiff's RFC

Social Security regulations require the ALJ to consider and evaluate every medical opinion received in determining whether a claimant is disabled.   *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").   Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."   20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

In weighing medical opinions, Social Security regulations require an ALJ to consider certain factors, including: (1) whether the claimant has an examining or treating relationship with the medical source; (2) the medical source's area of specialization; (3) whether the medical source's opinion is well-supported; and (4) whether the opinion is consistent with the record as a whole. 20 C.F.R. §§ 404.1527(c)(i)-(v), 416.927(c)(i)-(v). Moreover, an ALJ must generally give controlling weight to the opinion of a treating source[9] about the nature and severity of a claimant's impairments if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c), 416.927(c)(2).

When an ALJ does not give controlling weight to a treating source's opinion, the ALJ must "clearly articulate" good cause for discounting it.[10] *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1240-41). The opinion of a non-examining source, however, "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision." *Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (citing *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985)).

---

[9] A "treating source" is the claimant's own medical source who has provided the claimant with medical treatment or evaluation, and who has had "an ongoing relationship" with the claimant. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An "ongoing relationship" generally means the claimant sees, or has seen, the physician or psychologist "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.* A medical source who has "treated or evaluated [the claimant] only a few times or only after long intervals (*e.g.*, twice a year)" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition." *Id.* Conversely, a medical source is *not* a treating source if the relationship "is not based on [the claimant's] need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of [the claim] for disability." *Id.*

[10] "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1241).

     *1.   Dr. Pabon is not a Treating Source*

On August 1, 2016, ARNP Foster and Dr. Pabon co-signed a letter addressed to Plaintiff's counsel regarding Plaintiff.  The letter stated:

> [Plaintiff] suffers from severe and persistent anxiety (social and generalized), and depression.  He also demonstrates social deficits consistent with his diagnosis of autism spectrum disorder.  These symptoms impact his ability to function across all domains in his life.  He rarely ventures outside of the house, and never does so unaccompanied or unprompted.  Social interactions cause him great distress and simple chores or daily tasks often overwhelm him.  His depression recently resulted in him being admitted to the psychiatric ward of Broward Health for a suicide attempt, and his condition has deteriorated since that visit.  It is for these reasons that it is my sincere belief that [Plaintiff] is unable at this time, or within the next 12 months, to participate in any type of occupational activity.

(R. 336).

Citing to this letter, Plaintiff argues that the "ALJ failed to properly evaluate the opinion of his treating psychiatrist, Dr. Pabon."  (ECF No. 21 at 12).  Plaintiff suggests that the ALJ "appears to attribute Dr. Pabon's opinion [at R. 336] to ARNP Foster alone, but a review of the treatment notes shows that Dr. Pabon in fact signed the narrative statement."  *Id.*  According to Plaintiff, "[i]t appears that Dr. Pabon and ARNP Foster share a practice . . . and worked together to manage [Plaintiff's] condition by the letterhead on which [Plaintiff's] prescriptions [are] written."  (ECF No. 21 at 12 n.9).

Plaintiff's suppositions about Dr. Pabon's role in Plaintiff's treatment are exaggerated and unsupported by the record.  First, the record does not reflect even one office visit at which Plaintiff was examined or treated by Dr. Pabon.[11]  Rather, as more fully set forth above, *see supra* Section III.B.3.a., it was ARNP Foster who treated Plaintiff (and/or refilled Plaintiff's prescriptions): three times in August, September and October 2015 (R. 368, 369-70, 371-72, 373,

---

[11] Indeed, Plaintiff acknowledges that the record does not contain any treatment notes from Dr. Pabon. *See* (ECF No. 21 at 23).

374); approximately 12 times between February 2016 and October 2016 (Exs. 2F, 5F); and five times between January and June 2017 (Exs. 6F and 8F).  In addition, Plaintiff testified that he visited ARNP Foster every month, "one on one," for prescription refills.  (R. 45).  Although ARNP Foster presumably works in the same practice as Dr. Pabon, Plaintiff could not recall ever having been treated by Dr. Pabon.  (R. 44-45).  Moreover, in a March 2016 Supplemental Pain Questionnaire, Plaintiff reported that he was "actively seeing [a] therapist 1-2 [times] per week" and a "psychiatric ARNP for medication [management] on a monthly basis."  (R. 250).  At the hearing, Plaintiff identified his therapist as Suzanne Peterson.  (R. 44).  Ms. Peterson confirmed that she was Plaintiff's "mental health counselor since May of 2016."  (R. 299).  Thus, in the absence of any evidence that Dr. Pabon ever treated or examined Plaintiff, the fact that Dr. Pabon may have co-signed the August 2016 letter, or that ARNP Foster used Dr. Pabon's prescription pad to write Plaintiff's prescriptions, or that the two worked in the same practice, does not transform Dr. Pabon into Plaintiff's treating physician.

In addition, whether a claimant is disabled and unable to work is an issue reserved for the Commissioner.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *see Denomme v. Comm'r of Soc. Sec.*, 518 F. App'x 875, 877-78 (11th Cir. 2013).  Accordingly, the statement that Plaintiff "was unable at this time, or within the next 12 months, to participate in any type of occupational activity," was not owed any deference or special consideration, even if provided by a treating physician.  *Lowery v. Comm'r of Soc. Sec.*, 729 F. App'x 801, 803 (11th Cir. 2018) (concluding that ALJ "entitled to disregard" a statement on an issue reserved to the Commissioner); *Denomme,* 518 F. App'x at 878.

18

Based on the foregoing, the undersigned concludes that the ALJ did not err in assessing Dr. Pabon's opinion, as he was not Plaintiff's treating source.  Moreover, the ALJ applied the correct legal standards and substantial evidence supports the ALJ's Decision.

### 2. *The ALJ Properly Assigned "Little Weight" to ARNP Foster's Opinions*

Next, Plaintiff argues that the ALJ erred in assigning "little weight" to the opinions of Plaintiff's primary mental health care provider, ARNP Foster.  (ECF No. 21 at 15-16).  According to Plaintiff, ARNP Foster's opinions should be entitled to "controlling weight" because "[he] provided primary care for [Plaintiff's] mental condition and  . . . his opinion is supported by the evidence of record."[12]  (ECF No. 28 at 3-4).  Specifically, Plaintiff argues that "ARNP Foster treated [Plaintiff] over the course of several years, offered an opinion regarding his functional limitations, and opined that [Plaintiff] was functionally disabled" and would be absent from work "due to his impairments or treatments more than three times per month."  (citing to R. 335, 336, 375, 379).  (ECF No. 21 at 16).  ARNP Foster's opinions, dated May 2016 [at R. 335], August 2016 [at R. 336], and February 2017 [at R. 375-84] are discussed below.

<u>May 16, 2016 and August 1, 2016 Opinions</u>

On May 16, 2016, ARNP Foster wrote a letter to the Social Security Administration, stating:

> [Plaintiff] continues to have angry outbursts periodically; the majority of the time he is extremely withdrawn.  These symptoms have not been resolvable through psychiatric medication.  He continues to have great difficulty with even the most basic life skills, such as grocery shopping and simple food preparation.  He struggles with being able to leave the apartment he shares, is rarely able to make eye contact or to clearly articulate his needs.  He often does not leave his room.  He has  been unable to engage in social interactions with peers.  In my opinion, he is clearly unable to work at the present time.

---

[12] Plaintiff's arguments are inconsistent: is ARNP Foster Plaintiff's primary care provider/treating source, or is it Dr. Pabon, as Plaintiff argued in the previous section?

19

(R. 335).  Lastly, ARNP Foster states that Plaintiff was hospitalized on May 15, 2016, "after a

suicide attempt by overdosing on Risperdal."  *Id.*

Thereafter, on August 1, 2016, ARNP Foster co-signed a letter (with Dr. Pabon, as

discussed above) addressed to Plaintiff's counsel.  (R. 336).  This letter is detailed above.

*See supra* Section V.A.1.  The ALJ gave ARNP Foster's May 2016 and August 2016 opinions

"little weight," and articulated his reasons as follows:

> I [give] little weight to all of the opinion statements offered by [Plaintiff's] primary
> care provider wherein he opined [that Plaintiff] would be unable to work, due
> generally, to angry outbursts; being extremely withdrawn; having great difficulty
> with most basic life skills, such as grocery shopping and food preparation;
> struggling with leaving the apartment he shares; inability to make eye contact or
> articulate needs; social deficits consistent with autism; a suicidal attempt; and rarely
> leaving his room or engaging in social interaction with peers.  (Exhibits 3F, 4F).[13]
> In addition, he noted that these symptoms have not been resolved through
> psychiatric medication.  (Exhibit 3F/1).  Said opinion is inconsistent with his own
> treatment notes which reflect the claimant regularly presented with depressed or
> anxious mood, but was otherwise noted to be oriented to person, place and time;
> had intact memory, judgment and insight; intact thought content; intact attention
> and concentration; neat appearance and clear speech; and fair sleeping and appetite.
> (Exhibits 5F/2, 6, 11, 13, 16, 19, 23, 26, 30, 33, 35, 8F/1, 4, 9, 13).  Moreover, the
> claimant was generally noted to be doing ok, with very few adjustments to his
> medication regimen, despite the practitioner's assessment of ineffectiveness.  In
> fact, the mot recent treatment notes from February to June of 2017 all reflect
> continuation of current medication regimen.  (Exhibit 8F).

(R. 18-19).

Against this backdrop, the undersigned finds that the ALJ clearly articulated his reasons

for discounting ARNP Foster's May and August 2016 opinions and that substantial evidence

supports the ALJ's Decision.  As the ALJ correctly noted, ARNP Foster's treatment notes are

inconsistent with the disabling opinions in the May 2016 and August 2016 letters.  *See* (R. 335,

336).  The record confirms that although Plaintiff sometimes presented with depressed or anxious

---

[13] Ex. 3F is R. 335; Ex. 4F is R. 336.

mood, he was consistently oriented to person, place and time; had intact memory, judgment and insight; intact thought content and thought process; intact attention and concentration; neat appearance and clear speech; and fair sleeping and appetite.   Indeed, upon mental status examinations in September and October 2015, Plaintiff's appearance was neat, speech was clear, mood was calm, affect was calm, thought process and content were intact, judgment and insight were intact, attention, concentration and memory were intact, and sleeping and appetite were fair. (R. 369, 371).   In February 2016, despite Plaintiff's report that his mind was racing and that he was angry and not sleeping, mental status examination results showed that Plaintiff was alert and oriented to person, place, and time, with neat appearance, clear speech, and intact thought process, thought content, judgment, insight, attention, concentration, and memory.   (R. 366).   At a March 2, 2016 visit, Plaintiff reported feeling "great," despite having depressed mood.  (R. 323). At a second visit in March 2016, and again in April, June and July 2016, Plaintiff's mental status examination results reflected intact mental functioning, except for depressed mood and affect. (R. 347, 349, 352, 355, 357).   In September and October 2016 and February and March 2017, Plaintiff reported "doing ok," with intact mental health status, except for mood (which ranged from calm to anxious) (R. 338, 342, 393, 397).   Similarly, in May and June 2017, other than anxious mood and flat affect, Plaintiff's mental status examinations reflected intact functioning. (R. 385, 388).

Accordingly, substantial evidence supports the ALJ's Decision to give "little weight" to these opinions as inconsistent with the record evidence and ARNP Foster's treatment notes.

<u>February 8, 2017 Mental Impairment Questionnaire</u>

On February 8, 2017, ARNP Foster completed a Mental Impairment Questionnaire ("MIQ").  (R. 375-84).  In the MIQ, ARNP Foster reports that he treated Plaintiff since July 15,

2015 for autism spectrum disorder and major depressive disorder, which caused "feelings of helplessness and hopelessness, high level of anxiety, [feelings of being] overwhelmed, no motivation, tearful[ness], social isolation."  (R. 375).  Plaintiff's medications included Celexa, Risperidone, and Adderall, with no reported side effects.  *Id.*

In assessing the February 2017 MIQ, the ALJ stated:

> In addition, the same practitioner completed a[n] [MIQ] wherein he noted similar symptoms in opining [that Plaintiff] had moderate to marked limitations in his ability to understand and remember; concentrate and persist; engage in social interactions; and in adaptation while also [noting that Plaintiff] would be likely to miss work more than three times per month due to his Autism and Depression. (Exhibit 6F, 7F).[14]   Nevertheless, despite his longitudinal relationship with [Plaintiff] and regular occasion to observe him, I also give this opinion little weight due to the aforementioned inconsistency with his own treatment notes and recommended treatment as well as the inconsistent testing previously addressed in this decision.  Further, the past work history includes full time work for several years at the Broward Clerk's office and Best Buy as a sales clerk[,] which appears inconsistent with the described symptoms of [a]utism spectrum disorder by testing and treating sources.

(R. 19).

The ALJ articulated several reasons for giving "little weight" to the MIQ.  First, despite the longitudinal relationship between ARNP Foster and Plaintiff, the ALJ found that the MIQ was inconsistent with ARNP Foster's treatment notes, all of which reflected intact mental status findings, other than depressed or anxious mood.  *See* (R. 19, 323, 338, 342, 347, 349, 352, 355, 357, 366, 369, 371, 385, 388, 393, 397).  Next, the ALJ noted that the MIQ was inconsistent with Plaintiff's psychological test results, in which "[Plaintiff's] responses were reportedly endorsed in a manner to present himself in a more severe light, highly suggesting that the [Plaintiff] was not answering each item in a frank manner . . . [which is] indicative of either severe psychopathologies

---

[14] Ex. 6F is the MIQ, found at R. 375-79; Ex. 7F is a duplicate copy of the MIQ, found at R. 380-84.

or when people over[-]report symptom presentations.  Accordingly, the examiner noted the results to be undeterminable. (Exhibit 2F/7)."  (R. 16).  Lastly, the ALJ found the MIQ to be inconsistent with Plaintiff's past work history, which reflected Plaintiff's ability to maintain stable employment for six years (four years at Best Buy and two years at the Broward County Clerk's Office) despite his allegedly disabling conditions.  (R. 19).  Against this record, the undermined finds that the ALJ properly assigned "little weight" to the MIQ, articulated his reasons for doing so, and substantial evidence supports the ALJ's Decision.[15]

Accordingly, the undersigned concludes that the ALJ properly evaluated ARNP Foster's May 2016 letter, August 2016 letter, and February 2017 MIQ, and clearly articulated his reasons, which were supported by substantial evidence in the record.  In addition, the undersigned notes that while the ALJ was required to, and in fact did, discuss and consider the opinions of ARNP Foster at length, ARNPs were not considered acceptable medical sources whose opinions would be entitled to controlling weight at the time of the ALJ's Decision.[16]  *Farnsworth v. Soc. Sec. Admin.*, 636 F. App'x 776, 783-84 (11th Cir. 2016) (citing 20 C.F.R. §§ 404.1513(d)(1),

---

[15] Plaintiff suggests that the results of the September 2015 psychological screening tests support his argument that there is evidence in the record reflecting his severe disability from anxiety, depression and autism.  (ECF Nos. 21 at 16-18, 28 at 4-5).  In fact, however, these test results do not undermine the ALJ's well-reasoned decision, but support it.  For example, Plaintiff's MMPI-II tests results were "uninterpretable" because the responses seemed designed "to present [Plaintiff] in a more severe light, highly suggesting that [Plaintiff] did not answer each item in a frank manner."  (R. 328).  As well, Plaintiff's RBANS results showed that Plaintiff scored within the average to lower end of average ranges in all batteries except for visuospatial functions, the only area in which he scored in the impaired range.  (R. 330).  Similarly, the AAA test results showed that Plaintiff "did not meet the cut off criteria" for autism, but was nonetheless diagnosed with autism on a provisional basis based, in part, on his self-reported stereotypical symptoms.  (R. 331).  Lastly, and not surprisingly, Plaintiff scored the worst (in  the severe range) in the BDI and BAI tests, which measure depression and anxiety based on self-reports.  (R. 329).

[16] A nurse practitioner is not considered an acceptable medical source for claims filed before March 27, 2017.  *See* 20 C.F.R. §§ 404.1502(7), 416.902(7).  Plaintiff's claims were filed in 2016.  (R. 211-14, 215-20).

404.1527(c), 416.913(d)(1), 416.927(c); SSR 06-03p, 2006 WL 2329939, at *2, *6) (explaining that "only 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight").  The ALJ weighed ARNP Foster's opinions as he would any other medical opinion, but was not required to give these opinions any specific weight.  *See* 20 C.F.R. §§ 404.1527, 416.927 (listing the factors an ALJ will consider when evaluating an opinion).  Thus, having found the three opinions to be inconsistent with ARNP Foster's treatment notes and unsupported by the record as a whole, the ALJ's assignment of "little weight" to these opinions was not error.  *Baez v. Comm'r of Soc. Sec.*, 657 F. App'x 864, 869 (11th Cir. 2016) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 2016)).

### 3.  *The ALJ Properly Evaluated the Opinions of the State Agency Physicians*

Relatedly, Plaintiff argues that the ALJ erred in assigning "partial weight" and "great weight" to the opinions of the State Agency non-examining physicians, Drs. Maxine Ruddock and Lawrence Annis, at the initial and reconsideration levels, respectively.  (ECF No. 21 at 18).  Plaintiff argues that these doctors, whose opinions were rendered in March and May 2016, respectively, did not have the benefit of reviewing the entire record.  *Id.*

Evidence from a non-examining medical expert is considered opinion evidence.  *Tagle v. Astrue*, 279 F. App'x 827, 829 (11th Cir. 2008) (citation omitted).  The weight given to a non-examining physician's opinion depends on its clinical findings and consistency with other evidence.  20 C.F.R. §§ 404.1527(b)-(c), 416.927(b)-(c).  Although they are not treating or examining physicians, the opinions of a medical expert may outweigh the medical opinion of a treating source.  20 C.F.R. §§ 404.1527(f)(1), 416.927(f); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996) (providing that opinions of State Agency medical and psychological consultants must be treated as expert opinion evidence).

24

Here, in light of the record as a whole, the ALJ's evaluation of the opinions of

Drs. Ruddock and Annis is supported by substantial evidence.  The ALJ explained:

As for State Agency psychologists, at the initial level, Maxine Ruddock, Ph.D., reviewed the claimant's medical records and opined the claimant was capable of comprehending and remembering uncomplicated vocational instructions, procedures and systems; the claimant's capacity for attending and persisting for 2 hour intervals while accomplishing job tasks consisting of straightforward, recurring and uniform steps is not seriously limited by the presence of the mental impairments; however, the signs and symptoms of the mental impairments could cause the claimant to have difficulty maintaining ideal levels of concentration, accuracy, patience, dependability and productivity, particularly in a socially intense work environment requiring multitasking under time pressure; claimant has the ability to communicate about specific aspects of task-oriented employment and abide by the standards governing basic conduct and appearance that are predominant in many vocational environments; but, adverse attitudinal, emotional and/or behavioral features of the mental impairments may increase claimant's risk for reacting ineffectively to the stress of extensive customer service and/or frequent collaboration among employees; and there is no compelling evidence to suggest that the claimant's capacity to appreciate/adhere to occupational safety guidelines, secure transportation to a jobsite, or do basic planning for work activities is especially limited; however, the functional disadvantages associated with the mental impairments have the potential to limit the claimant's capacity to adjust effectively to abrupt changes in the established work schedule/process or employer expectations-especially those perceived as personally disadvantageous. (Exhibit 1A)[.]  While portions of this opinion are generally consistent with the extant objective medical evidence, other portions wherein the opinion seemingly makes a conclusion about the claimant's functional capabilities and then immediately casts doubt on said opinion are inconsistent. While I agree that the claimant's symptoms seem to wax and wane with occasional periods of exacerbation, which would certainly limit the claimant, I note that a residual functional capacity represented the most and not the least a claimant can do and the residual functional capacity herein, similar to the conclusions above adequately accounts for said limitations. Accordingly, this opinion is only given partial weight.

On the other hand, Lawrence Annis, Ph. D., also only reviewed the claimant's medical records at the reconsideration level and opined the claimant would be capable of performing simple, routine and repetitive tasks in setting with limited social demands and which are not fast paced or quota driven; concentrating and persisting at time and repetitive tasks within physical tolerances and skill levels for periods of two hours at a time through an 8 hour work day with possible additional supervision while working on new and multi-step assignments; can cooperate on routine tasks and transactions, but may be best suited for employment in environments with limited interaction with coworkers and the general public, although he retains the ability to adapt to moderate interpersonal demands as

needed during the course of a work week; and the claimant may have some difficulty in adapting to change in routine but will be able to function within a stable work assignment, will be better able to adapt after initial employment period, and is mentally able to avoid hazards, travel independently, and set goals. (Exhibit 4A, 5A). While this opinion is inconsistent with that of the claimant's treating sources and he was only able to review the claimant's medical records and did not have an opportunity to personally examine the claimant, I find his opinion to be more consistent with relatively conservative treatment and the primarily normal mental status examinations throughout, as mentioned above. Accordingly, I give this opinion great weight. In doing so, I note that I adopted more vocationally specific terminology in the residual functional capacity. For example, while I find the above assessment regarding difficulties in adaptation to work environment to be consistent with the objective medical evidence, I find the limitation contained in the RFC to better posit the claimant's requisite limitations in vocationally understandable terminology of being able to adapt to a routine work setting wherein changes to the work environment would be gradual.

(R. 20-21).

Drs. Ruddock and Annis are both experts in their fields, holding Ph.D. degrees. *See* (R. 68, 71, 82, 85, 95, 98). Moreover, both doctors reviewed the record evidence and adequately explained their conclusions. *See generally* (R. 63-73) (DIB Initial); (R. 76-87) (DIB Reconsideration); (R. 89-100) (SSI Reconsideration); *see also, T.R.C. ex rel. Boyd v. Comm'r of Soc. Sec. Admin.,* 553 F. App'x 914, 917-18 (11th Cir. 2014) (concluding that the ALJ properly gave substantial weight to the opinion of a non-examining source because the doctor provided supporting explanation for the opinion and it was supported by the record); *Forsyth v. Comm'r of Soc. Sec.*, 503 F. App'x 892, 893 (11th Cir. 2013) (affirming the ALJ's decision to give more weight to the opinion of non-examining doctor); *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873-74 (11th Cir. 2011) (holding that the ALJ did not err in relying on the reports of non-examining physicians "because their opinions were supported by the record"); *Ogranaja v. Comm'r of Soc. Sec.*, 186 F. App'x 848, 851 (11th Cir. 2006) (holding that substantial evidence supported the ALJ's decision to assign great weight to non-examining physicians' opinions that "were supported by and consistent with the record as a whole"); *Key v. Comm'r of Soc. Sec.*, No. 12-CV-415-OC-18PRL,

2013 WL 4774768, at *7 (M.D. Fla. Sept. 4, 2013) (finding no error in the ALJ's reliance on the testimony of a non-examining medical expert who reviewed the entire record and opined on claimant's limitations).

Ultimately, it is the ALJ's duty to weigh the medical evidence. *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (reiterating that the ALJ is to weigh the evidence and make credibility determinations). Here, the ALJ properly weighed the medical opinions, applied the proper legal standards, and the ALJ's determination is supported by substantial evidence.

### B.  The ALJ Properly Determined Plaintiff's RFC

A claimant's RFC is the most a claimant can do despite the limitations caused by his impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Social Security regulations classify the physical exertion requirements for work as sedentary, light, medium, heavy, and very heavy. *See* 20 C.F.R. §§ 404.1567, 416.967. Along with age, education, and work experience, the ALJ considers a claimant's RFC in determining whether the claimant can work. *Lewis*, 125 F.3d at 1440 (citation omitted). An RFC determination is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite his impairments. *Id.* In the end, the responsibility for determining a claimant's RFC rests with the ALJ, and the ALJ is not required to give any special significance to the opinion of medical sources in determining the RFC. *Lewen v. Comm'r of Soc. Sec.*, 605 F. App'x 967, 968 (11th Cir. 2015) (upholding ALJ's RFC finding that accounted for medical opinions not specifically discussed by the ALJ).

Plaintiff argues that the ALJ's error in evaluating the medical opinions of ARNP Foster and the State Agency non-examining physicians resulted in an incorrect RFC determination. *See generally* (ECF No. 21 at 14-19). More specifically, Plaintiff argues that the ALJ's RFC assessment is flawed because the ALJ: (i) failed to include the disabling limitations described in

ARNP Foster's 2017 MIQ;  and (ii) relied exclusively on the State Agency consultants' opinions to formulate the RFC.   (ECF No. 21 at 15, 18).   For the reasons discussed below, the undersigned finds no error in the ALJ's RFC determination.

### 1.   ARNP Foster's 2017 MIQ

The ALJ's Decision reflects the ALJ's consideration of the entire record, including Plaintiff's testimony, opinion evidence, Plaintiff's self-reports, and the State Agency consultants' opinions.  *See* (R. 13-20) (ALJ's thorough discussion of medical evidence in Exs. 1A, 4A, 5A, 5E, 1F, 2F, 3F, 4F, 5F, 6F, 7F, 8F, 9F, 10F, and 11F).   Based on his analysis of the evidence, the ALJ included multiple mental restrictions in the RFC, and limited Plaintiff to simple tasks, simple instructions, avoiding fast-paced assembly-type jobs with strict quotas, and requiring only gradual changes in the work environment.   (R. 14).   The ALJ's RFC also included restrictions to account for Plaintiff's limitations in understanding, remembering and applying information, such as limiting Plaintiff's concentration and persistence to "extended" periods, maintaining superficial work relationships with supervisors and coworkers, and avoiding work-related contact with the general public.  *Id.*  As discussed previously, the ALJ properly assigned "little weight" to the MIQ after finding that the MIQ was unsupported by the medical record and inconsistent with ARNP Foster's treatment notes.  *See supra* Section V.A.2.

Having found that the MIQ was unsupported by the medical evidence, *supra* Section V.A.2, the ALJ was "not required to include findings in the hypothetical that the ALJ has properly rejected as unsupported."  *Crawford*, 363 F.3d at 1161; *see also Denomme*, 518 F. App'x at 879 (citations omitted) ("[A]n ALJ is not required to instruct the VE to assume conditions that he does not find exist."); *Norman v. Comm'r of Soc. Sec.*, No. 8:14-CV-1498-T-30MAP, 2015 WL 4397150, at *8 (M.D. Fla. July 16, 2015) (citations omitted) (the ALJ submits to the expert only

those limitations supported by the objective evidence of record).  Accordingly, the ALJ did not err in omitting the MIQ's limitations from the RFC.

2.  *Opinions of State Agency Consultants*

Plaintiff also argues that the ALJ erred by relying exclusively on the opinions of the State Agency consultants in determining Plaintiff's RFC.  (ECF No. 21 at 18).  According to Plaintiff, the consultants did not have the opportunity to review records dated after March/May 2016, so their opinions did not reflect Plaintiff's complete medical history.  *Id.*  Plaintiff also complains that the "ALJ did not grant weight to any other assessment of RFC . . . and that the opinions of the State [A]gency [consultants] alone are insufficient to support an RFC assessment."  (ECF No. 21 at 19).

Although Plaintiff is correct that "opinions of a non-examining physician do not constitute substantial evidence when standing alone," Plaintiff's argument misses the mark.  *See* (ECF No. 21 at 18); *see also Swindle*, 914 F.2d at 226 n.3 (citing *Broughton*, 776 F.2d at 962) (noting that the opinion of a non-examining source "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision.").  Here, the ALJ did not rely exclusively on the opinions of non-examining consultants in assessing Plaintiff's RFC.  Rather, as reflected in the ALJ's detailed and thoughtful decision, the ALJ considered the entire record.  *See* (R. 13-20) (ALJ's thorough discussion of medical evidence in Exs. 5E, 1F, 2F, 3F, 4F, 5F, 6F, 7F, 8F, 9F, 10F, and 11F).[17]  Thus, the undersigned finds no error in the ALJ's RFC determination, which is supported by substantial evidence in the record.  *See, e.g.*, *Ogranaja*, 186 F. App'x at 851 (finding no error where the ALJ did not rely solely on State Agency physician's opinion).

---

[17] The State Agency opinions are found in Exs. 1A, 4A, and 5A, which the ALJ also discussed in his decision.  *See* (R. 20).

### C.  The ALJ Properly Evaluated Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ erred in discounting Plaintiff's statements about the intensity and limiting effects of his symptoms.  (ECF No. 21 at 19-22).

A claimant's statements about his symptoms will not alone establish disability. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a).  Thus, when a claimant attempts to show disability through his own testimony about pain or other subjective symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms."  *Contreras-Zambrano v. Soc. Sec. Admin., Comm'r,* 724 F. App'x 700, 703 (11th Cir. 2018) (citing SSR 16-3p, 82 Fed. Reg. 49462-03, 49463-65 (Oct. 25, 2017)).  "Step two is to evaluate the intensity and persistence of an individual's symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities."  *Id.* (citing SSR 16-3p, 82 Fed. Reg. at 49464-66); *see* 20 C.F.R. §§ 404.1529(c), (d), and 416.929(c), (d).

In conducting this two-step inquiry, an ALJ considers all the evidence, including "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence, including [claimant's] history, the signs and laboratory findings, and statements by [the claimant's] medical sources or other persons about how [his] symptoms affect [him]."  20 C.F.R. §§ 404.1529(c)(2)-(4), 416.929(c)(2)-(4).  On review of the ALJ's decision, the question is not "whether [the] ALJ could have reasonably credited [Plaintiff's] testimony, but whether the ALJ was clearly wrong to discredit it."  *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Here, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that Plaintiff's statements concerning

the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (R. 16). The ALJ articulated several reasons for discounting Plaintiff's statements:

> As for [Plaintiff's] statements about the intensity, persistence, and limiting effects of [his] symptoms[,] they are inconsistent because the overwhelming majority of treatment notes reflect[] [Plaintiff] was reportedly doing okay[,] with some depression or anxiety noted on exam but otherwise normal findings. Moreover, treatment of said symptoms was relatively conservative with only a few adjustments in medication. (See generally Exhibits 1F, 2F, 5F, 8F, 9F, 10F).

(R. 18).

The undersigned finds that the ALJ adequately articulated his reasons for discrediting Plaintiff's testimony. First, Plaintiff's subjective complaints were inconsistent with ARNP Foster's treatment notes from 2015 through 2017, which reflected that, except for some depression or anxiety, Plaintiff was consistently oriented to person, place and time; had intact memory, judgment and insight; intact thought content and thought process; intact attention and concentration; neat appearance and clear speech; and fair sleeping and appetite *See* (R. 19, 323, 338, 342, 347, 349, 352, 355, 357, 366, 369, 371, 385, 388, 393, 397); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1223 (11th Cir. 2002) (holding that ALJ properly discredited claimant's testimony for reasons including that it was inconsistent with objective medical evidence). Plaintiff's allegations were also inconsistent with Plaintiff's self-reports that he was "doing ok." (R. 18, 338, 342, 397); *see Hernandez v. Comm'r of Soc. Sec.*, 523 F. App'x 655, 656-57 (11th Cir. 2013) (holding that substantial evidence supported ALJ's conclusion that objective medical records and plaintiff's self-reports were inconsistent with subjective complaints).

In addition, the ALJ noted that Plaintiff's MMPI-II test results were "uninterpretable" because Plaintiff's responses seemed designed "to present [Plaintiff] in a more severe light, highly suggesting that [Plaintiff] did not answer each item in a frank manner." (R. 16); *see also* (R. 328).

As well, Plaintiff's RBANS scores were within the average to lower end of average ranges in all batteries except for visuospatial functions, in which he scored in the impaired range. (R. 330). The AAA test results showed that Plaintiff "did not meet the cut off criteria" for autism, but was nonetheless diagnosed with autism on a provisional basis based, in part, on his self-reported symptoms. (R. 331). These test results undercut Plaintiff's allegations of disabling symptoms.

Next, the ALJ found that Plaintiff's subjective complaints were inconsistent with his conservative treatment, which consisted of infrequent medication adjustments. (R. 18, 361 (adding Adderrall in April 2016), 365 (adding Risperdal in February 2016), 369 (adding Trazadone in September 2015), 372 (discontinuing Trazadone in October 2015), 414 (increasing Celexa to 20 mg); *see* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); *Pennington v. Comm'r of Soc. Sec.*, 652 F. App'x 862, 873 (11th Cir. 2016) (ALJ properly considered claimant's conservative treatment with medication as evidence undermining his testimony); *Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (noting that doctor's conservative medical treatment for a particular condition tends to negate a claim of disability). Moreover, Plaintiff testified that he took medications, which helped his condition, without any side effects. (R. 46). Once again, the ALJ's decision is supported by substantial record evidence.

Lastly, the ALJ found Plaintiff's subjective complaints inconsistent with his past work history at the Broward County Clerk's Office and Best Buy. (R. 19, 39-41, 235, 245). Plaintiff maintained steady employment for six years despite his allegedly disabling limitations. *See* 20 C.F.R. §§ 404.1529(c)(3)-(4), 416.929(c)(3)-(4) (claimant's history can be considered when determining whether subjective complaints are consistent with the record); *see also Douglas v. Comm'r of Soc. Sec.*, 486 F. App'x 72, 75 (11th Cir. 2012) (finding it was not error for ALJ to consider claimant's work and other strenuous activities in evaluating credibility); *Dyer v.*

*Barnhart*, 395 F.3d 1206, 1211-12 (11th Cir. 2005) (ALJ properly discounted claimant's subjective complaints for reasons including claimant's long work history despite allegedly disabling neck pain).

Against this backdrop, the undersigned finds that the ALJ did not err in discounting Plaintiff's statements as "not entirely consistent with the medical evidence and other evidence in the record." (R. 16); *see, e.g.*, *Vason v. Astrue*, No. 2:09-CV-912-TFM, 2010 WL 2629444, at *5 (M.D. Ala. June 30, 2010) (concluding that ALJ did not err in discounting claimant's testimony where conflicts existed within her testimony and between her testimony and the record). Ultimately, credibility determinations are the province of the ALJ, and a clearly articulated credibility finding with substantial supporting record evidence, such as here, will not be disturbed. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005); *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see also, Pettaway v. Astrue*, 376 F. App'x 889, 890 (11th Cir. 2010) (finding no reversible error where ALJ provided specific reasons for discrediting claimant's testimony); *May v. Comm'r of Soc. Sec. Admin.*, 226 F. App'x 955, 958 (11th Cir. 2007) (noting that the ALJ provided sufficiently explicit and adequate to reasons to partially discredit claimant); *Dyer*, 395 F.3d at 1212 (finding reversible error where court disturbed an ALJ's adequately explained determination regarding claimant's subjective complaints).

### D.   The ALJ Satisfied His Duty to Develop a Full and Fair Record

Next, Plaintiff argues that the ALJ erred in failing to fully develop the record by failing to obtain additional medical records from: (i) Broward Health regarding a May 2016 overdose/suicide attempt; and (ii) purported treatment notes from Dr. Pabon. (ECF No. 21 at 22-23). As to the Broward Health records, Plaintiff argues that "[d]espite the relevance of this hospitalization, the record contains no hospital records or other records pertaining to his suicide

attempt and corresponding treatment." (ECF No. 21 at 23). As to Dr. Pabon, Plaintiff argues that "Dr. Pabon treated [Plaintiff] for over two years" and the ALJ could not properly evaluate Dr. Pabon's opinion without reviewing his treatment notes. *Id.* Thus, Plaintiff argues that "the ALJ failed to satisfy his duty to fully develop the record," and the case should be reversed and remanded. The undersigned disagrees.

Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). This obligation exists even when a claimant is represented by counsel and requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Id.* (citations and quotations omitted); *Jones v. Astrue*, 863 F. Supp. 2d 1142, 1154 (S.D. Ala. 2012) ("[T]he ALJ must probe into all relevant facts, even where a claimant is represented by counsel.") (citing *Cowart*, 662 F.2d at 735). Further, the ALJ must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735; *see also Fontanez v. Barnhart*, 195 F. Supp. 2d 1333, 1357 (M.D. Fla. 2002) (remanding the case where the ALJ failed to determine the significance of claimant's limited test scores). Nonetheless, in evaluating whether a case should be remanded for an ALJ's purported failure to fully develop the record, courts consider whether there are evidentiary gaps in the record that result in unfairness or "clear prejudice" to the claimant. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) (citations omitted); *see also Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997). As explained below, there is no evidentiary gap nor resulting prejudice here.

Pursuant to Social Security Regulations, in situations where the ALJ is unable to make a disability determination because the evidence in the record is insufficient or inconsistent, the ALJ

*may* need to take additional action, including re-contacting a medical source or requesting additional evidence.  20 C.F.R. §§ 404.1520b(b)(2)(i)-(ii), 416.920b(b)(2)(i)-(ii).  But that is not the situation here.  Here, the record contains opinions from multiple mental health care providers and physicians, including treatment notes from Care Resource (Exs. 1F, 9F, 10F), examination results from doctors at the Motivational Institute (Ex. 2F), ARNP Foster's treatment notes and opinions (Exs. 2F, 3F, 4F, 5F, 6F, 7F, 8F), therapist Peterson's letter (Ex. 11F), and the opinions of Drs. Ruddock and Annis (Exs. 1A, 4A, 5A).  The record also contains Plaintiff's Adult Function Report (Ex. 5E), and his testimony at the hearing (R. 38-56).  The ALJ reviewed these records, which contain more than sufficient evidence for the ALJ to make an informed decision.  *See* (R. 13-20); *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999); *see also Prunty v. Acting Comm'r of Soc. Sec. Admin.*, 635 F. App'x 757, 759-60 (11th Cir. 2015) (finding that an additional evaluation of a medical expert was neither necessary nor required where the record contained multiple medical evaluations and opinions).

In addition, the records which the ALJ reviewed include information about Plaintiff's suicide attempt and hospitalization at Broward Health.  *See, e.g.,* (R. 335, 336) (May 2016 and August 2016 letters referencing Plaintiff's hospitalization for attempted suicide); (R. 349) (June 2016 treatment notes reflecting Plaintiff's report that he was "in the hospital for 2 weeks"); (R. 376) (February 2017 MIQ referencing Plaintiff's past suicide attempt).  As well, Plaintiff testified about his attempted suicide.  (R. 42-43).  Thus, Plaintiff has not shown that he was prejudiced by the ALJ's purported failure to develop the record or established the existence of any evidentiary gaps.  *See Graham*, 129 F.3d at 1423; *Washington v. Astrue*, 558 F. Supp. 2d 1297, 1298 (N.D. Ga. 2008) ("To warrant remand for the ALJ's failure to develop the record, there must be a showing of prejudice.").  Additionally, Plaintiff has not explained what information the

Broward Health records contain and how such information would have affected the ALJ's Decision. *See Rivera v. Comm'r of Soc. Sec. Admin.*, No. 6:12-CV-232-ORL-GJK, 2013 WL 557214, at *7 (M.D. Fla. Feb. 14, 2013) (to establish prejudice, the claimant must explain how the missing medical evidence prevented the ALJ from making an informed decision or affected the ALJ's overall disability determination). Although Plaintiff generally asserts "the relevance" of the Broward Health records, "speculation about the contents of those records does not justify a remand." *Echevarria v. Colvin*, No. 8:12-CV-1801-T-TGW, 2013 WL 4518212, at *5 (M.D. Fla. Aug. 23, 2013); *Rivera*, 2013 WL 557214, at *8 (rejecting claim of prejudice from ALJ's failure to develop record because claimant did not indicate how missing medical records supported allegations of disability). In any event, even assuming the existence and favorable nature of the Broward Health records, the records would simply be cumulative of other evidence in the record discussing Plaintiff's May 2016 suicide attempt. *See, e.g.,* (R. 42-43, 335, 336, 349, 375, 377).

Furthermore, Plaintiff's statement that Dr. Pabon "treated [Plaintiff] for over two years" is conclusory and unsupported by the record. *See* (ECF No. 21 at 23). There is simply no indication in the record that such treatment notes exist. Rather, the record unambiguously reflects that it was ARNP Foster who treated Plaintiff. In addition, Plaintiff testified that he saw ARNP Foster every month, "one on one," for prescription refills. (R. 45). Although ARNP Foster works in the same practice as Dr. Pabon, Plaintiff testified that he could not recall ever having been treated by Dr. Pabon. (R. 44-45). Moreover, in a March 2016 Supplemental Pain Questionnaire, Plaintiff reported that he was "actively seeing [a] therapist 1-2 [times] per week" and a "psychiatric ARNP for medication [management] on a monthly basis." (R. 250). Lastly, it was ARNP Foster who authored and signed Plaintiff's prescriptions. *See, e.g.,* (R. 325, 337, 341, 344, 346, 351, 361,

364, 365, 368, 373, 374, 390, 396, 399).   Plaintiff's suggestion that the ALJ should have "re-contacted" Dr. Pabon for "clarification" fails for the same reasons.  *See* (ECF No. 21 at 13, 23). Accordingly, Plaintiff's argument about the possible treatment notes from Dr. Pabon fails as speculative and unsupported by the record.  *See* (ECF No. 21 at 23).

In sum, although the ALJ has a basic duty to develop a full and fair record, it is Plaintiff who bears the burden of proving that he is disabled and producing evidence to support his claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (citations omitted).  Here, Plaintiff has failed to establish any evidentiary gap in the record that resulted in unfairness or clear prejudice. Accordingly, the undersigned finds that the ALJ satisfied his duty to develop a full and fair record.

### E.  The ALJ's Hypothetical to the Vocational Expert Was Proper

Lastly, Plaintiff argues that the ALJ's hypothetical to the Vocational Expert was incomplete.  (ECF No. 21 at 23-25).  The ALJ questioned the VE about a hypothetical individual of Plaintiff's age, education, and previous work experience, with no exertional limitations, but with the following mental restrictions.  The individual: (i) could understand, remember and apply simple instructions; (ii) could concentrate and persist for extended periods to complete simple work with routine supervision; (iii) would need to avoid fast-paced assembly-type jobs with strict quotas; (iv) could maintain superficial work relationships with coworkers and supervisors; (v) would need to avoid work relationships with the general public; and (vi) could adapt to routine work setting in which changes were introduced gradually.  (R. 57-58).

In response, the VE testified that such an individual could not perform Plaintiff's past relevant work but could perform other work in the national economy.  (R. 58-59).  If, however, the same individual were further limited to being off task 20% on a typical workday, then that individual would not be able to maintain any job.  (R. 59).  Upon examination by Plaintiff's

counsel, the VE further testified that an individual would need to be able to concentrate and focus for two hours at a time to maintain any job.  (R. 60).

According to Plaintiff, the ALJ's hypothetical was incomplete because it failed to include additional limitations to address: (i) the moderate to marked limitations in concentration and persistence noted in the MIQ (R. 378); (ii) the ALJ's finding at Steps 2 and 3 that Plaintiff had marked limitations in understanding, remembering, and applying information[18] (R. 13); and (iii) Dr. Annis' opinion that Plaintiff could sustain concentration and persist at simple tasks for two hours at a time (R. 84, 97).   (ECF No. 21 at 24-25).  Plaintiff's argument fails for several reasons.

First, the ALJ's hypothetical limited Plaintiff to understanding, remembering and applying simple instructions; concentrating and persisting for extended periods to complete simple work with routine supervision; and avoiding fast paced assembly jobs with strict quotas.  (R. 57-58). These limitations fairly accounted for the limitations in the ALJ's RFC, which, as discussed above, *see supra* Section V.B., is supported by substantial evidence.  Moreover, the ALJ is "not required to include findings in the hypothetical that the ALJ has properly rejected as unsupported," such as those in the MIQ.  *Crawford*, 363 F.3d at 1161; *see also Norman*, 2015 WL 4397150, at *8 (citations omitted) (noting that the ALJ submits to the expert only those limitations supported by the objective evidence of record); *Denomme*, 518 F. App'x at 879 (citations omitted) ("[A]n ALJ is not required to instruct the VE to assume conditions that he does not find exist).

Second, Plaintiff's argument that the hypothetical fails to include Dr. Annis' limitation to concentrate and persist for "two hours at a time" ignores the exchange between the VE and

---

[18] Based on a review of the evidence, the ALJ found at Steps 2 and 3 that Plaintiff had: (i) marked limitations in understanding, remembering, or applying information, (ii) moderate limitations in interacting with others; (iii) moderate limitations in his ability to concentrate, persist or maintain pace; (iv) moderate limitations in his ability to adapt or manage himself.  (R. 12-14).

Plaintiff's counsel.  Upon questioning by counsel, the VE testified that an individual would need to concentrate and focus for two hours at a time to maintain any job.  (R. 60).  Moreover, the ALJ's hypothetical, which limited the individual's ability to concentrate and persist for "extended periods," necessarily incorporated the two hour limitation in Dr. Annis' opinions.  Indeed, pursuant to Social Security Regulations, an employee must be able to concentrate for two-hour intervals, which is the time between the employee's morning, lunch, and afternoon breaks before concluding the workday.  *See Soc. Sec. Admin.,* Program Operations Manual System (POMS) DI25020.010 Mental   Limitations   (B)(2)(a),   https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010   (last visited July 20, 2020) (explaining that mental abilities related to understanding, carrying out, and remembering instructions in any job includes the ability to "maintain concentration and attention for *extended periods* (the approximately *2-hour segments* between arrival and first break, lunch, second break, and departure)") (emphasis added).

Accordingly, the undersigned finds no error in the ALJ's hypothetical and resulting RFC determination, which are supported by substantial evidence in the record.

## VI.   RECOMMENDATION

Accordingly, the undersigned respectfully **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No. 21) be **DENIED,** that Defendant's Motion for Summary Judgment (ECF No. 25) be **GRANTED**, and that the ALJ's Decision be **AFFIRMED** for the reasons set forth above.

Within **fourteen** (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. J. R. 4(b) (allowing 14 days for written objections unless a different time is prescribed by

the Court).  The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation.  11th Cir. R. 3-1 (2020); *see Thomas v. Arn*, 474 U.S. 140 (1985).

 **DONE AND ORDERED** at Chambers, in Fort Lauderdale, Florida, on July 20, 2019.

ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

cc: U.S. District Judge Beth Bloom
 All Counsel of Record